UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 20 CR 443 |
| | ) | |
| v. | ) | Honorable Robert W. Gettleman |
| | ) | |
| JOHN SEIWERT | ) | |

**GOVERNMENT'S RESPONSE TO**
**DEFENDANT'S MOTION TO SUPPRESS STATEMENT**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby responds to defendant's motion to suppress the statements he made to law enforcement. Dkt. 50. Because defendant's statements to law enforcement were voluntary, the government respectfully requests that defendant's motion be denied without a hearing.

## I.    BACKGROUND

### A.    Factual Background

***Search Warrant Execution***

On July 30, 2020, U.S. Magistrate Judge M. David Weisman signed a warrant authorizing the search of the residence located at 8830 Golfview Drive in Orland Park, Illinois. Ex. A ¶ 1 (ATF ROI 47). Later that same day, at approximately 2:25 p.m., law enforcement officers executed the warrant. *Id.* After knocking failed to result in anyone answering the front door, investigators opened the door with tools. *Id.* ¶ 2. And after entering the home, investigators encountered defendant, who was "irate, yelling, and flailing his arms." *Id.* Defendant was also observed making furtive

movements with his hands, and investigators handcuffed him while the entry team secured the residence. *Id.* Investigators also encountered Individual A in the kitchen. *Id.* Individual A complied with law enforcement's requests and was not handcuffed. *Id.*

Once investigators conducted a sweep of the residence, defendant and Individual A were escorted to the front of the residence. *Id.* After it appeared that defendant had calmed down, ATF Special Agent David LaMonte removed the handcuffs. *Id.* ¶ 3. Investigators told defendant and Individual A that they were not under arrest and were free to leave, which they each acknowledged. *Id.* Individual A was permitted, at her request, to reenter the residence escorted by law enforcement to retrieve a pack of cigarettes and her phone. *Id.* At defendant's request, officers retrieved his dog and his cell phone from the residence. *Id.* ¶ 4. As explained below, defendant's dog traveled with defendant to the station. Agent LaMonte took possession of defendant's cell phone pursuant to the search warrant, which specifically authorized its seizure and subsequent search. *Id.*

Agent LaMonte asked defendant and Individual A if they would be willing to speak with law enforcement at the Orland Hills Police Department. Ex. B, at 3 (MPD report). Agent LaMonte advised defendant and Individual A that they were not in handcuffs, not under arrest, and were free to leave at any time. *Id.* Both acknowledged they were free to leave and agreed to accompany law enforcement to the Orland Hills Police Department, where they could speak in private. *Id.*

2

During a consensual pat-down of defendant before defendant entered an unmarked police vehicle, Agent LaMonte located $600 on defendant's person. *Id.* Defendant explained that he planned to use $60 to purchase "dope" from a drug dealer, whom defendant identified by an initial, but that the dealer probably saw law enforcement and left. *Id.*

### Transport to Orland Hills Police Department

Defendant and Individual A were transported to the Orland Hills Police Department in the unmarked police vehicle, which was equipped with audio and video recording equipment that was activated during the trip.

Both defendant and Individual A entered the back seat of the vehicle without handcuffs and unaided by law enforcement. Ex. C, at 00:40-2:00 (vehicle footage). Individual A was holding a pack of cigarettes and a lighter; defendant was accompanied by his dog. *Id.* Before the vehicle's doors were closed, Agent LaMonte asked defendant and Individual A whether they needed any "medication or anything." *Id.* Both indicated they did not. *Id.*

After the door was closed, and before Agent LaMonte and Midlothian Police Department Officer Matthew Kickert entered the vehicle, defendant and Individual A had a brief conversation during which defendant asked whether law enforcement was "seizing all the fucking guns," and stated that he did not know "where [he] put the dope at." Ex. B, at 3 (MPD report). Defendant and Individual A then discussed the location of the dope, and whether defendant would be charged with a crime, with

defendant stating, "I don't wanna get charged for anything like that dumbass." *Id.*

When Agent LaMonte entered the vehicle, he thanked defendant and Individual A for cooperating, indicated that their discussions would take time, and added that they might as well go sit somewhere air conditioned. Ex. C, at 5:40-5:49 (vehicle footage). Defendant and Individual A indicated that they did not have much information to share. *Id.* at 5:49-6:03. Agent LaMonte responded that he could get them a bottle of water at the police department, and that they could get a "smoke out front" and "relax." *Id.* at 5:49-6:12. Defendant then asked Agent LaMonte "what kind of weed [he] smoke[d]" and laughed after posing the question. *Id.* at 6:12-6:25.

Soon thereafter, defendant asked Agent LaMonte if they were going to the Orland Park Police Department. *Id.* at 6:47-7:05. Agent LaMonte advised defendant they were going to the Orland Hills Police Department because it was Tim McCarthy's (the then-Orland Park Police Department Chief) last day and they were having a "big send-off" for him at the Orland Park Police Department. *Id.* Defendant responded, "I know T-Mac," and later added that "T-Mac" "took a bullet for Reagan."[1] *Id.* Below is a still image taken from the video capturing this exchange, depicting defendant smiling and in a relaxed posture:

---

[1] *See* Mike Nolan, "Orland Park police Chief Tim McCarthy, the Secret Service agent shot while protecting President Reagan, to retire after 26 years,"Chicago Tribune, July 1, 2020, available at https://www.chicagotribune.com/suburbs/daily-southtown/ct-sta-orland-park-police-chief-retire. (last visited June 24, 2021).



After defendant commented that his sister was going to be "so fucking pissed," Agent LaMonte reminded defendant that he was not under arrest. *Id.* at 7:32-8:10. Defendant responded, "I know that," and then asked Agent LaMonte if law enforcement could leave anything they found "drug-wise" in the residence. *Id.*

During the trip, Agent LaMonte asked defendant whether "we have treated you fairly today," to which defendant responded, "yes, sir," then asked Agent LaMonte what investigators found in his house. *Id.* at 8:55-9:12. After Officer Kickert indicated that investigators probably had not even started searching the residence because there was "stuff everywhere," Individual A stated that defendant's dad "was a hoarder." *Id.* at 9:12-9:23. Agent LaMonte expressed his condolences for the passing of defendant's father.[2] *Id.* at 9:23-9:55.

---

[2] According to publicly available information, defendant's father passed away in late June 2020.

Defendant asked whether officers found crack cocaine in the residence and added that he did not recall "where he put it." *Id.* at 9:55-10:30. Officer Kickert told defendant that they did find crack in his house, but that he was "still not in handcuffs," to which defendant responded that he was a "user, not a drug dealer," and that "it would be different if [he] was a fucking drug dealer." *Id.* at 10:30-10:45.

Later during the drive, Agent LaMonte asked defendant how his dog was doing, and they had a brief exchange about the dog. *Id.* at 11:20-11:45. Defendant then stated that he was "so fucking tired" and closed his eyes while Individual A talked about dogs. *Id.* at 11:45-12:45. Defendant then opened his eyes, again stated that he was tired and that he "doesn't know shit about nothing," and commented that his sister was going to "fucking kill [him]," *id.* at 12:45-13:05, before closing his eyes for the remainder of the trip to the police department. *Id.* at 13:05-16:30. Upon the opening of the vehicle door, defendant opened his eyes, picked up his dog, and walked out of the vehicle without assistance. *Id.* at 16:30-16:35.

### *Interview at the Orland Hills Police Department*

After arriving at the Orland Hills Police Department, defendant was escorted to an interview room equipped with video and audio recording equipment. Defendant walked into the room on his own without handcuffs and holding a bottle of water. At the start of the interview, Agent LaMonte reminded defendant that he was not under arrest, to which defendant responded, "I know I'm not." Ex. D, at 2:50-2:55 (first interview video). Agent LaMonte also told defendant that the door was unlocked and

6

that defendant was "welcome to" leave, but added that he did not think that would happen because defendant had so far been a "cool dude." *Id.* at 2:55-3:25.

Agent LaMonte read defendant his *Miranda* rights and the waiver language from an "Advice of Rights and Waiver" form. *Id.* at 3:25-4:30. Defendant nodded his head as the language was read, and confirmed that Agent LaMonte had not promised him anything. *Id.* Defendant then signed and dated the waiver without hesitation or qualification. *Id.*; *see also* Ex. E (Advice of Rights and Waiver form). Defendant also agreed that Agent LaMonte had "treated him right" and was "doing his job." Ex. D, at 4:30-4:45 (first interview video).

As captured in the video footage, at no point during the interview that followed defendant's waiver of his *Miranda* rights did Agent Lamonte or Officer Kickert raise their voices towards defendant. They remained in their chairs across the table from defendant. They did not make any threats or promises to defendant. Defendant remained attentive, and provided detail about his involvement in narcotics dealing that reflected that he was acting knowingly and voluntarily.

Specifically, per the video evidence, the following occurred during the interview.

At the start of the interview, defendant rested his head on the table, but assured Agent LaMonte that he was listening. *Id.* at 4:45-4:55. Agent LaMonte requested background information, such as defendant's social security number, which defendant provided. *Id.* at 4:55-5:30. Soon thereafter, Agent LaMonte asked

defendant to sit up, which defendant did while explaining that he was tired because he was up all night cleaning. *Id.* at 5:30-5:43. Agent LaMonte asked defendant when he "last used"; defendant admitted that he did so a couple hours ago. *Id.* at 5:43-5:53. Agent LaMonte asked defendant if he was "all right now," and defendant responded, "yeah, I guess." *Id.*

Defendant told Agent LaMonte about his 20-year history of daily drug use, including his use of crack cocaine earlier that day. *Id.* When defendant appeared to ask why they were discussing his drug history, Agent LaMonte told defendant that he would see if he could provide defendant with "some referrals for some help." After defendant appeared to indicate that he did not need help, Agent LaMonte stated, "I don't like seeing this, dude. Your dad is part of the blue family…I think your dad would appreciate us at least trying to direct you to something, and whether or not you take it, you're a man." *Id.* at 7:00-7:25. During this exchange, defendant stated that he "was going to be a cop, too," but that the degree requirements were changed. *Id.*

The discussion then turned to a safe, containing numerous guns, in defendant's residence. *Id.* at 7:25-11:00. Defendant signed a written consent to search his phone so that agents could obtain his sister's phone number and seek her assistance in accessing the safe. *Id.* Defendant then provided information regarding the firearm and drug-related activity of Individual B, including details regarding estimated dates of certain events. *Id.* at 11:00-13:40. Defendant also provided details about an

incident in which Individual B took a gun from him. *Id.* at 13:40-19:00.

During the interview, defendant alternated between sitting up and resting his head on the table. Defendant also yawned and appeared tired during the interview. Below is a still image taken from the interview video that shows defendant sitting up as he identified individuals in photographs:



During this same portion of the interview, when Agent LaMonte indicated that he could try to refresh defendant's recollection if defendant did not remember something, defendant appeared to state that he remembered "everything," and referenced being a "functioning addict." *Id.* at 19:15-19:45.

When asked what he knew about Individual B's background, defendant initially stated that he did not know "shit" about Individual B, *id.* at 20:45-21:00, but

then provided information about text messages he exchanged with Individual B, including messages containing addresses that defendant admitted were locations to which he had delivered drugs at the direction of Individual B. *Id.* at 19:45-30:40.

Later during the interview, when Agent LaMonte asked about two other individuals, defendant refused to provide information, stating that he did not "want the shit to come back to him, really." *Id.* at 30:40-31:50. Defendant continued to answer questions about his text messages with Individual B, however, and provided additional details about Individual B taking a gun from him, including that he expected Individual B to provide him with drugs in exchange at a later point.[3] *Id.* at 31:50-35:00. During this discussion, defendant explained that Individual C asked him to provide a false affidavit stating that he left the gun at Individual B's residence, and identified for Agent LaMonte the location at which he met with Individual C in connection with her request. *Id.* at 35:00-38:25. Defendant explained that he did not provide the false affidavit because he was "not an idiot" and "did not want to get caught up in this bullshit." *Id.* at 38:25-39:10. Defendant further explained that he and others were doing work for Individual B, and that Individual B was paying them with drugs. *Id.* at 39:10-39:35.

In response to questions about a text message he sent to Individual B containing an image of money, defendant denied being a drug dealer. *Id.* at 39:35-43:10. Defendant was then asked who was involved in Individual B's operation;

---

[3] Individual B was charged in a federal indictment with possessing the gun he obtained from defendant.

defendant indicated that Individual B worked on his own and denied knowing Individual B's source of supply. *Id.* at 43:10-43:35. Defendant also denied knowing about others who were involved in drug dealing. *Id.* at 44:40-44:45.

The interview then transitioned to other topics. Defendant and Agent LaMonte shared a laugh after Agent LaMonte stated that San Diego (the apparent city in which defendant last received drug treatment) was "the best city in the world," a contention with which defendant disagreed. *Id.* at 44:45-46:20. In response to questions about a photograph of a dresser found at his residence, defendant commented that he had found old photographs, from the 1980s, that depicted the same dresser, and provided his exact address in the 1980s. *Id.* at 46:30-47:40. Defendant also summarized other past residences. *Id.* at 47:40-48:20.

Later in the interview, Agent LaMonte asked defendant how his drug use affected his relationship with his father; defendant indicated that it had affected his relationship with his entire family. *Id.*

The interview then turned back to narcotics trafficking and guns. When asked about other drug dealers, defendant provided general information about Individual D, but stated that he did not really know Individual D. *Id.* at 48:20-49:11. Defendant again denied knowing who supplied narcotics to Individual B, but identified two individuals who helped Individual B cut and weigh narcotics, and added that he "helped them a little bit." *Id.* at 49:00-50:15. Agent LaMonte asked defendant who else had defendant's father's guns and added that defendant's father would not want

11

his guns on the streets of Chicago; defendant responded, "nobody." *Id.* at 50:15-50:30.

Soon thereafter, Agent LaMonte told defendant that he could sit outside while law enforcement spoke with Individual A. *Id.* at 50:30-52:30. Defendant stood up on his own, walked to the door, opened it, and exited the room with Officer Kickert behind him. *Id.* Defendant later reentered the interview room to ask Agent LaMonte if he could help him expunge a ticket. *Id.* at 52:30-53:55. Below is a still image taken from the interview video footage capturing defendant making his request, again showing defendant to be attentive and not inebriated:[4]



After their interview of Individual A, the interviewing officers asked defendant to answer additional questions. As defendant walked back into the room on his own and without handcuffs, Agent LaMonte stated, "sorry, man, I know you're tired, we woke you up." Ex. F, at 00:35-00:45 (second interview video). Agent LaMonte then

---

[4] Agent LaMonte told defendant that he did not have authority to get the ticket expunged. *Id.* at 53:00-53:55.

explained that he had additional questions about defendant's text messages with Individual B—namely, a text message sent with a photograph of a gun on defendant's leg. *Id.* at 00:45-1:15. Before Agent LaMonte was able to locate a copy of the text message, defendant recalled the specific message. *Id.* at 1:15-2:15. Defendant also identified the caliber of a gun in the photograph, the length of the gun's barrel, and its price. *Id.* Defendant estimated that there were over 100 guns in the safe at his residence, and that his father (the owner of the guns) kept guns throughout the house. *Id.* at 2:15-3:15. Defendant then provided additional information about Individual B. *Id.* at 3:15-6:45.

Before walking out of the room at the end of the interview, Agent LaMonte offered defendant a bottle of water, which defendant declined. *Id.* at 6:45-7:00. Defendant asked if he could go smoke. *Id.* Agent LaMonte reminded defendant that the door was unlocked, and stated, "yeah, go smoke." *Id.*

Following the interview, defendant left the interview room and remained in the lobby of the police department. Ex. G ¶ 5. (ATF ROI 48). Defendant asked Officer Kickert, who was standing nearby, if officers "can't just leave the dope? I'm gonna be sick if I don't get any." *Id.* Shortly thereafter, defendant was arrested in the lobby. *Id.* ¶ 6. Defendant was handcuffed and transported to the Orland Park Police Department for housing pending his appearance in federal court. *Id.* ¶¶ 6-9.

### B.     Procedural History

On July 31, 2020, defendant was charged by complaint with being an unlawful user of a controlled substance in possession of firearm. Dkt. 1. The grand jury later returned an indictment charging defendant with the same offense. Dkt. 13.

### C.     Defendant's Motion to Suppress

On May 27, 2021, defendant moved to suppress the statements he made to law enforcement on July 30, 2020. Dkt. 50 ("Mot."). In his motion, defendant argues that the interviewing officers coerced his statements because he was under the influence of drugs. Mot. at 7. Defendant also contends that his statements were involuntary because the interviewing officers referenced his father's status as a former member of law enforcement. *Id.*

## II.     ARGUMENT

As reflected in the video footage, defendant provided detailed responses to some questions, declined to answer others, and confirmed that his drug use did not impair his ability to recall information and that he was a "functioning addict." Law enforcement did not make any threats or promises to defendant, or otherwise coerced him to speak. Because the objective evidence demonstrates that defendant voluntarily spoke with law enforcement, his motion should be denied without a hearing.

14

### A.     Defendant's Statements Were Voluntary.

It is the government's burden "to prove the voluntariness of [a defendant's] statement by a preponderance of the evidence." *United States v. Villalpando*, 588 F.3d 1124, 1128-29 (7th Cir. 2009) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)). "A confession is voluntary if in light of the totality of circumstances, it was not secured through psychological and physical intimidation but rather was the product of a rational intellect and a free will." *United States v. Charles*, 476 F.3d 492, 497 (7th Cir. 2007) (internal quotation marks and citation omitted). "Such circumstances include whether the defendant was read his *Miranda* rights, the defendant's age, the duration and nature of questioning, and whether the defendant was punished physically." *Id.* (internal quotation marks and citation omitted). Trickery, deceit, even impersonation do not render a confession inadmissible, "unless government agents make threats or promises." *Id.* Indeed, "[c]onfessions or other admissions obtained in the course of an interrogation are deemed involuntary and therefore inadmissible only if they are procured by threats or promises." *Id.*

The totality of the circumstances, as evident from the recorded interview, demonstrates that defendant's statements were voluntary.

First, defendant was not "in custody" for *Miranda* purposes when interviewed because there was no "formal arrest or a restraint on his or her freedom of movement of the degree associated with a formal arrest." *United States v. Patterson*, 826 F.3d 450, 455 (7th Cir. 2016) (internal quotation marks and citation omitted). Defendant

was advised that he was not under arrest, asked to voluntarily accompany the officers to the police station, permitted to bring his dog with him to the police station, not handcuffed during transport, and told that he could leave the station via an unlocked door at any time. Indeed, before being presented with a *Miranda* waiver, defendant confirmed that he understood that he was not under arrest, and was advised that he was free to leave through the unlocked door behind him. Ex. D, at 2:55-3:25 (first interview video). Nonetheless, out of an abundance of caution, defendant was advised of his *Miranda* rights, and validly waived any such rights in writing.

The government has a relatively low bar to clear in proving an intelligent waiver of *Miranda* rights. *Collins v. Gaetz*, 612 F.3d 574, 588 (7th Cir. 2010). "It is only when the evidence in the case shows that the defendant could not comprehend even the most basic concepts underlying the *Miranda* warnings that the courts have found an unintelligent waiver." *Id.* Here, by contrast, defendant nodded his head as Agent LaMonte read him the waiver language, orally confirmed that Agent LaMonte had not made any promises to him, and signed the waiver. *See* Ex. D, at 1:45-4:40 (first interview video). Defendant's words and actions demonstrate that he understood what potential rights he had when he signed the *Miranda* waiver.[5]

---

[5] Defendant's later responses to questions also reflect his understanding of his potential rights. When asked about Individual B, defendant tried to minimize his knowledge of Individual B. *Id.* at 20:45-21:00. Defendant also tried to minimize his involvement in cutting and weighing narcotics for Individual B. *Id.* at 49:00-50:15. These responses reflect that defendant knew the information he provided regarding Individual B (and his relationship with Individual B) could be used against him.

Second, the interviewing officers did not use coercion of any sort. "The issue of coercion is determined from the perspective of a reasonable person in the position of the suspect." *United States v. Haddon*, 927 F.2d 942, 946 (7th Cir. 1991) (internal quotation marks and citation omitted). Before they left the residence, law enforcement retrieved defendant's dog and checked to see if defendant needed any medication. During the interview, interviewing officers were polite and did not raise their voices at defendant. They remained seated during the interview and did not physically intimidate defendant. They allowed defendant to take a smoke break. They provided defendant with water and did not handcuff him. Ex. D, at 1:45-2:50 (first interview video). They did not threaten or promise defendant anything in exchange for information. In short, interviewing officers treated defendant with courtesy and respect.

Contrary to defendant's claims, at no point did the interviewing officers suggest that defendant was receiving (or would receive) special treatment because he was part of the "blue family." *See* Ex. C (vehicle footage), Ex. D (first interview video), Ex. F (second interview video). While a false promise of leniency may render a statement involuntary, it must be of the sort that would render defendant unable to make a rational decision "by distorting the alternatives among which the person under interrogation is being asked to choose." *See, e.g., Villalpando*, 588 F.3d at 1128-29 (rejecting claim that false promise of leniency was made by officer who stated she would "sit down" with law enforcement to "work this out" and also said "we don't have

17

to charge you"). Here, although defendant's father was referenced a few times during the interview, these references were limited and did not equate to a promise that defendant would receive any special treatment in the event of potential criminal charges. *See* Ex. D, at 7:00-7:25 (father mentioned in reference to drug referral); *id.* at 47:40-48:20 (father mentioned in connection with history of drug use); *id.* at 50:15-50:30 (father mentioned in reference to location of father's guns).

Defendant's efforts to reframe the courteous and respectful treatment he received, along with Agent LaMonte's condolences for the death of defendant's father and offer to provide drug treatment referrals, as a form of psychological coercion are legally unsupported. Even assuming (as defendant does) that these actions were calculated to promote cooperation, they do not rise to the level of coercion. *See Dassey v. Dittmann*, 877 F.3d 297, 316 (7th Cir. 2017) ("officers may deceive suspects through appeals to a suspect's conscience, by posing as a false friend, and by other means of trickery and bluff").

Defendant's assertion that his statements were involuntary because he was under the influence of crack cocaine at the time of the interview fares no better. Per defendant's comments at the time of his interview, he used crack a few hours before law enforcement officers arrived at his house. But even assuming the truth of this statement, defendant's asserted drug use alone does not establish involuntariness. *See United States v. Walker*, 272 F.3d 407, 413 (7th Cir. 2001).

As an initial matter, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *Stechauner v. Smith*, 852 F.3d 708, 718 (7th Cir. 2017). "A diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." *United States v. Chrisman,* 965 F.2d 1465, 1469 (7th Cir. 1992) (citation omitted). Here, there was no coercion: As demonstrated above, there was no physical coercion, and interviewing officers' courteous and respectful treatment of defendant, along with Agent LaMonte's condolences for the death of defendant's father and offer to provide drug treatment referrals, does not constitute mental coercion.

In addition, the video recording—including defendant's physical condition, demeanor, ability to recall and explain detailed information and historical events, and refusal to answer certain questions—establishes that, despite any potential intoxication arising from his drug use, defendant was coherent, capable of rational thought, aware of his rights and, therefore, acted knowingly and voluntarily. *See United States v. Reynolds*, 367 F.3d 294, 297 (5th Cir. 2004) (defendant's meth use an hour before interview and alleged sleep deprivation did not make statements involuntary); *United States v. Howard*, 532 F.3d 755, 763 (8th Cir. 2008) (use of drugs did not render confession involuntary where defendant was coherent); *United States v. Gulledge*, 2020 WL 6737450, at *2-4 (S.D. Ind. Sept. 14, 2020) (finding statements voluntary where defendant was alert and coherent during the interview, responded

to questions posed to him, and did not attempt to stop the interview); *see also United States v. Fields*, 2009 WL 3029726, at *10 (E.D.N.C. Sept. 21, 2009) (*Miranda* waiver of defendant, a heroin addict, valid despite drug use in light of defendant's "significant tolerance to the drug" and recording that showed defendant speaking "logically and clearly").

To be sure, defendant appeared tired during the interview. But his apparent tiredness, or his drug use, did not compromise his mental state or his ability to interact with interviewing officers. The video recording clearly establishes that defendant was acting rationally and exercised his will when interacting with law enforcement. He freely conversed with the interviewing officers. He spoke logically. He answered questions in a coherent manner. He appeared to understand the questions. He gave detailed answers. Defendant was able to recall, for example, his social security number (*id.* at 4:55-5:30), the exact address of where he lived in the 1980s (*id.* at 46:30-47:40), the year he moved to Maryland (*id.* at 47:40-48:20), and the caliber of a specific gun and the length of its barrel (Ex. F, at 1:15-2:15).

The substance of defendant's answers also reflect that he was coherent. Defendant actively discussed Individual B and provided detail about Individual B's narcotics operation. By contrast, defendant refused to provide information about certain other narcotics suppliers, citing fear of retaliation. Ex. D, at 30:40-31:50 (first interview video). This calculation reflects that defendant understood the consequences of his statements, and that his will was not overborne by law

20

enforcement. *See United States v. Carson*, 582 F.3d 827, 834 (7th Cir. 2009) (affirming ruling that confession was voluntary despite defendant's claim that he had overdosed on heroin at the time officers administered rights where defendant chose to answer some questions and not others).

Defendant's mental acuity during the interview is further evidenced by defendant's request that Agent LaMonte help him expunge a ticket. Ex. D, at 52:30-53:55 (first interview video). This request reflects defendant's rational attempt to leverage his interaction with law enforcement to obtain a personal benefit. This attempt, along with defendant's other self-interested behavior during the interview, demonstrates that defendant exercised his free will and voluntarily spoke with law enforcement.

### B.     An Evidentiary Hearing Is Unnecessary.

Defendant's allegations are based on statements made by law enforcement during the trip to the police station and interview, both of which were video recorded in their entirety. Defendant does not allege that law enforcement made any statements or took any actions relevant to his motion that are not captured on those recordings. Accordingly, there are no disputed issues of material fact and an evidentiary hearing is not necessary. *United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011). As set forth above, the Court must determine whether, as a legal matter, law enforcement's actions towards defendant, a longtime crack cocaine addict, were sufficient to render his statements involuntary. That determination can be made

without a hearing.

## III.    CONCLUSION

For the reasons stated above, defendant's motion to suppress should be denied

without an evidentiary hearing.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    */s/ Ramon Villalpando*
RAMON VILLALPANDO
MAUREEN MERIN
Assistant United States Attorneys