UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff, | ) | |
| | ) | 20 CR 443 |
| v. | ) | Honorable Robert W. Gettleman |
| | ) | |
| JOHN SEIWERT, | ) | |
|     Defendant. | ) | |

**DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO SUPPRESS STATEMETNS**

NOW COMES defendant, JOHN SEIWERT, by and though his attorney, QUINN A. MICHAELIS, and respectfully submits the following reply to the Government's Response to Defendant's Motion to Suppress Statements. In support, Mr. Seiwert states as follows:

### I. Mr. Seiwert Was In Custody

"The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. *United States v. James,* 113 F.3d 721, 726 (7th Cir. 1997), *quoting Stansbury v. California*, 511 U.S. 318, 323 (1994). The Seventh Circuit has identified the following factors that the Court should consider in determining whether a person is in custody:

    (1) The encounter in a public place;
    (2) The suspect consented to speak to the officers;
    (3) The officers informed the individual that he was not under arrest;
    (4) The individuals were moved to another area;
    (5) There was a threatening presence of several officers and a display of weapons or physical force;
    (6) The officers deprived the suspect of documents needed to depart; and

1

(7) The officers tone of voice was such that their request would likely be obeyed.
*United States v. Ambrose*, 668 F.3d 943, 956 (7th Cir. 2012).

Here, the factors suggesting that Mr. Seiwert was in custody are as follows:

(1) The encounter was not in a public place. The bulk of the encounter occurred inside an interrogation room at the Midlothian police department.

(2) While the reports indicate that Mr. Seiwert agreed to accompany agents to the police department for questioning, his initial agreement is the only relevant part of the encounter that was not videotaped.

(3) Before Mr. Seiwert and Individual A were transported to the police seized Mr. Seiwert's cell phone, (Doc. 52, Ex A). It further appears that Mr. Seiwert did not have a wallet with him, and it is unclear from the reports whether the $600 in cash that was found during the pat down search of Mr. Seiwert was returned to him when it was found.

(4) Mr. Seiwert was transported from his home to a police station in the back of "Midlothian PD caged vehicle." (Doc. 52, Ex A)

(5) Questioning at the police station occurred in a room with the door closed and with two armed federal agents whose firearms were visible on their hips.

(6) Instead of leaving at the conclusion of the interviews, Mr. Seiwert and Individual A remained at the police station while Officer Kickert stood near. (See Gov. Ex G).

Even if Mr. Seiwert was told he was free to leave, he had no way to leave—he was driven to the police station in a police car, he did not have a phone, and he did

2

not have a wallet. The encounter had all the trappings of custody, from Mr. Seiwert's transport to the police station in the back of a caged police car, to his placement in an interrogation room with two armed agents. Most importantly, Mr. Seiwert indicated that he would become sick from withdrawals if he were not given any drugs. *See* Gov. Ex. G. If he were free to leave as the government argues, he would have left the police department after the first interview to obtain the drugs that he was repeatedly concerned about from the car ride to the station until after his interview. Mr. Seiwert stayed seated, and repeatedly requested that the officers leave the drug evidence behind for him to use, instead of simply leaving the station to go purchase the drugs he was concerned he would begin to withdraw from. Further, the agents tell Mr. Seiwert after they speak to individual A, they will take him where he needs to go—indicating he must stay at the police station and could not leave until Individual A spoke with the agents, and the agents could drive Mr. Seiwert somewhere else. *See* Gov. Ex. D at 52:00.

Under the totality of the circumstances, Mr. Seiwert was in "in custody" for purposes of *Miranda*.


**II.     The Statement Was The Product Of Law Enforcement Coercion.**

"Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). When the interrogating officers have reason to know a suspect is under the influence of drugs or alcohol, "a lesser

3

quantum of coercion may be sufficient to call into question the voluntariness of the confession." *United States v. Carson*, 582 F.3d 827, 833-34 (7th Cir. 2009) (quoting *United States v. Haddon,* 927 F.2d 942, 946 (7th Cir. 1991)).

Deprivation of sleep can amount to law enforcement coercion and can be considered physical punishment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1972), citing *Reck v. Pate*, 367 U.S. 433 (1961), *see also, Ashcroft v. Tennessee*, 322 U.S. 143, 153 (1944), *Andersen v. Thieret,* 903 F.2d 526, 530 (7th Cir. 1990) (stating that "[f]ood, sleep, and water deprivation and a mentally coercive interrogation" would produce involuntary confession. Further citing *Ashcoft* as holding that continuous interrogation by multiple interrogators is a factor making confessions involuntary.), *United States v. Gillaum,* 372 F. 3d 848, 856-7 (7th Cir. 2004).

Not only did the officers know that Mr. Seiwert was sleep deprived from his behavior, but Mr. Seiwert told the agents at the beginning of the interrogation that he had been up all night. As early as the car ride to the police station, Mr. Seiwert appeared to be nodding off, both at the beginning of the ride, at minute 5:05-5:38, and at the end of the car ride while Mr. Seiwert appears to fall asleep, at minute 11:45. *See* Gov. Ex. C.

It is clear from the video of the actual interrogation that Mr. Seiwert wanted to sleep. As soon as he entered the interrogation room and sat down he placed his head in his hands. When one of the agents left the room to find a pen, Mr. Seiwert placed his head down in his arms, apparently trying to sleep. He did not speak with the other agent in the room , and maintained this resting posture even when the

4

other agent returned to the room. He did not pick his head up off the table until the agent told him to look at him.

During the most important part of the interrogation, when Mr. Seiwert was being read his *Miranda* rights, his head was in his arms, turned away from the agent, turned in a manner indicating that he is trying to block out the light from the room, and he was not following along with the agent reading those rights to him. When the agent asked him if he understands his rights, he wobbles his head on his arms, but does not orally indicate a response to the agent's questions. At the moment Mr. Seiwert picks his head up off the table, the agent pulls the document away from Mr. Seiwert who has not read the form along with the agent. After signing the form, Mr. Seiwert begins to rub his eyes and then places his head back on the table in a sleeping position. He remains in this position as the Agent asks for biographical information, Mr. Seiwert's statements are mumbled and trail off as he recites some of this information. The agent then tells Mr. Seiwert to sit up, and he again begins rubbing his eyes, and tells the agents that he has been up all night cleaning the house. Both Mr. Seiwert's statements and his behavior clearly indicate that he was exhausted and wanted to sleep. The agents did not allow him that sleep, and instead continued with their unrelenting questioning. As one agent searches through his phone for new topics to bring up, the other steps and continues the questioning. There is hardly a break in the questioning, and the questions repeatedly skip from topic to topic.

At one point, Mr. Seiwert indicates that he doesn't know anything about what the agent is asking, is interrupted by the agent, and in response Mr. Seiwert states, "what do you want me to know about him?" Gov. Ex. E at 20:55. This is but one example of the agents talking over Mr. Seiwert and interrupting him when he indicates that he doesn't know anything about a particular item.

Later in the interrogation Mr. Seiwert begins yawning repeatedly between questions. At Government Exhibit D, 30:39, Mr. Seiwert begins to yawn. As Mr. Seiwert attempts to explain how contacts are saved in his phone, the agent shouts something inaudible as Mr. Seiwert attempts to answer the question. Mr. Seiwert yawns again and then puts his head in his hand. *Id.* at. 31:24 At minute 33:06, Mr. Seiwert yawns and states, "I'm so beat." The agent presses on with his questions and does not acknowledge Mr. Seiwert's expression of exhaustion. At minute 34:26, Mr. Seiwert begins yawning again (lasting for 10 seconds), and eventually puts his head back down in his arms. Yawning again at minute 36:58 and 37:32, Mr. Seiwert frequently rests his head on the table in a manner indicating he is trying to sleep. At 45:00 Mr. Seiwert raises his head up and swears before yawning again. At minute 45:18, Mr. Seiwert shakes his head, apparently trying to stay awake, before putting his head back on his arms and then yawning again at 45:33. Mr. Seiwert begins rubbing his eyes again at minute 46:02, and yawns loudly at 46:32, and 48:05. By minute 49:48, Mr. Seiwert begins shivering and yawning again.

The agent tells Mr. Seiwert that his father would not want one of his guns on the street. *Id.* at 50:15. Mr. Seiwert falls silent then states "oh man" and shivers. *Id.* at 50:24. The agent then asks Mr. Seiwert if he needs a sip of water, and Mr. Seiwert yawns and shakes his head no, blinks his eyes in an exaggerated manner, and begins to wobble in his chair. *Id.* at 50:25. The agent then tells Mr. Seiwert that the agent could "talk all night." *Id* at 50:34. Exhausted, Mr. Seiwert replies, "I don't know what else you want from me." *Id* at 50:39.

Immediately the agent places another photograph in front of Mr. Seiwert. After stating he doesn't know anything about the individual, he begins answering the agents questions with just nods of his head as he repeatedly catches himself while leaning forward. *Id.* at 50:45-51:25

At 51:50 the agents finally tell Mr. Seiwert that he can take a break to rest, and as the agent explains this, Mr. Seiwert slowly leans forward again as if he is already falling asleep. The interview continues after the agents spoke with Individual A. As Mr. Seiwert reenters the interrogation room, the agent states "I know you're tired, I just woke you up." Gov. Ex. F at 00:39

Under the totality of the circumstances, Mr. Seiwert's statements were not simply the product of intoxication, but the result of coercive law enforcement behavior. The agents continued to questions Mr. Seiwert in the face of his clear exhaustion, with barely a break in between questions. Such sleep deprivation amounted to coercion.

### III. The Statements Were Not Voluntary.

In addition, a valid waiver of *Miranda* rights is necessary before a custodial statement may be admitted. *Miranda v. Arizona,* 384 U.S. 436, 476, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) A valid waiver is necessary but not sufficient for a voluntary statement: a statement may still be found involuntary under the totality of the circumstances even though the waiver was valid. *Baskin v. Clark,* 956 F.2d 142, 145 (7th Cir.1992)

At the start of the interrogation at the police station, the agents knew that Mr. Seiwert had ingested crack cocaine a few hours before the questioning began. They pressed further for more information and Mr. Seiwert told the agents that he was a daily user of ½ gram of crack cocaine and ½ gram of heroin. *See* Gov. Ex. G. Further, Mr. Seiwert's behavior during the car-ride to the police station and his behavior at the police station indicate that the drugs he admitted to using only a few hours previous were still affecting his system.

While in the police vehicle, Mr. Seiwert's speech is slurred and he fidgets around in his seat during the ride. His mood cycles between jovial, to pleading, to irritated that the officers will not leave the drugs they find at the house. *See* Gov. Ex. C.
At the station, Mr. Seiwert's mood continues to change frequently, going from putting his head in his hands to suddenly turning and laughing with the agent. *See* Gov. Ex. D at 2:15. His speech is mumbled and trailing throughout the interrogation. Further, the agents indicate that they are concerned enough about

8

Mr. Seiwert's state that they intend to get him help—after the interrogation. There can be no doubt that the agents knew that Mr. Seiwert was still under the influence of whatever substances he had used before law enforcement arrived at Mr. Seiwert's home. They could observe it from his behavior and even asked him for details about his drug use. Most importantly, when the agent asked Mr. Seiwert if he was still under the influence of drugs, Mr. Seiwert shrugged and said "I guess."

Not only did Mr. Seiwert lack the "'full awareness" of both the nature of the right being abandoned and the consequences of the decision to abandon it," *Moran v. Burbine* 475 U.S. 412, 421 (1986), but under the totality of the circumstances, Mr. Seiwert's statements to law enforcement were not voluntary because they were the result of coercive sleep deprivation and intoxication.

IV. CONCLUSION

For the reasons stated above and in his Motion to Suppress Statements, Mr. Seiwert respectfully requests this Court grant his motion to suppress statements.

Respectfully Submitted,

s/ Quinn A. Michaelis
Quinn A. Michaelis
Attorney for John Seiwert
73 W. Monroe, Suite 106
Chicago, IL 60603
312-714-6920

9

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2021, I electronically filed the above

**DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO SUPPRESS STATEMETNS**

with the Clerk of Court using the CM/ECF system to all listed parties in the case.

Respectfully Submitted on July 26, 2021.

By Her Attorney,

s/ Quinn A. Michaelis

Quinn A. Michaelis
Attorney For JOHN SEIWERT
73 W. Monroe, Suite 106
Chicago, Illinois 60603
312-714-6920